UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

KOREY COLE,

     Petitioner,

v.                                                    Case No. 4:18cv83-WS-HTC

SECRETARY, FLORIDA DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____/

<u>REPORT AND RECOMMENDATION</u>

This matter is before the Court on Petitioner Korey Cole's ("Cole") petition for writ of habeas corpus under 28 U.S.C. § 2254.[1]  ECF Doc. 1.  The matter was referred to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  The undersigned has reviewed the parties' submissions, the record and the relevant law.  For the reasons set forth below, the undersigned recommends the Petition be **DENIED** without an evidentiary hearing.

---

[1] Respondent filed a response (ECF Doc. 15), and Cole was given an opportunity to file a reply (ECF Doc. 16) and failed to do so.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Charges

On May 11, 2011, Cole was charged in a thirty-two-count information with eight robberies involving kidnapping, and sometimes battery, in multiple stores around the Tallahassee area in 2007 and 2008.  ECF Doc. 15-1 at 22 (Record in the Direct Appeal, p. 15).  Count 1 charged Cole with racketeering for participating in these eight robberies with Anthony Keel and Cory Carroll.  Count 2 charged him with conspiracy to commit the racketeering in Count 1.

Counts 3-5 involved a robbery with a deadly weapon (a BB gun) on October 13, 2007 of a Harvey's Supermarket in which manager Ronald Cull was kidnapped and battered with a deadly weapon (the same BB gun).  Counts 6-8 involved an attempted robbery with a deadly weapon (the BB gun) of the same Harvey's on April 3, 2008 and involved kidnapping Cull with a weapon (the BB gun) and kidnapping Susan Self, also an employee of Harvey's, with a weapon (the BB gun).

Counts 9-12 involved a June 23, 2008 attempted robbery of Walgreens and manager Tommy Moore.  This time, the counts alleged an attempted robbery of Walgreens with a "firearm"; the robbery, kidnapping and battery on Moore; and the kidnapping of cashier, Ericka Williams.  Counts 13-15 involved a June 25, 2008 robbery at Family Dollar, which also involved an alleged kidnapping of employees Nicole Arnett and Maggie Richardson with a weapon (the BB gun) and robbery of them and Family Dollar with a deadly weapon (the BB gun).

Counts 16-20 involved a June 26, 2008 robbery at Dollar Tree, in which employees Lakicia Hunter, Jack Woodrum, Felicia Thompson and Shenieka Lowe were kidnapped with a firearm. Hunter and Dollar Tree were robbed with a firearm. Counts 21-27 involved a kidnapping, battery and robbery of George Rizkalla, a manager at Walgreens, and burglary of Walgreens on June 29-30, 2008.

Counts 28-29 involved a robbery of a Dollar General on August 4, 2008; the kidnapping of employee Terry McKeever using a weapon (the BB gun); and the robbery of McKeever and Dollar General using a deadly weapon (the BB gun). Count 30-32 involved a robbery of another Dollar General on August 25, 2008; the kidnapping of employee Caroline Miles with a weapon (the BB gun); the kidnapping of employee Hellon Ford with a weapon (the BB gun); and robbery of both employees and the Dollar General with a deadly weapon (the BB gun).

## B. General Factual Background from the Trial[2]

The robberies at issue followed the same basic *modus operandi*. ECF Doc. 15-2 at 21. The main perpetrators, who came to be known as the "Hide and Seek Bandits," *id.* at 20, were Petitioner, Anthony Keel, and Cory Carroll. They were sometimes joined by Reginald Chatman, Lyndon Williams or William Witherspoon. The perpetrators observed a store location for some time before deciding to rob it,

---

[2] The trial and sentencing transcript make up ECF Doc. 15-2, and the two are paginated identically. The trial, including jury selection, was held from May 14, 2012 to May 17, 2012, and sentencing took place immediately after the jury verdict, on May 17, 2012. ECF Doc. 15-1 at 6.

often trying to have an inside man.  After selecting a location and casing it, the men would meet at either Cole or Carroll's apartment to plan the robbery.  ECF Doc. 15-2 at 608.  The perpetrators dressed in black clothing, covering their skin, and adorned ski masks.  They usually carried a black and silver BB gun that appeared to be a real gun.  Two or more of the perpetrators would gain access to the store after it was closed or before it opened, restrain everyone inside at gun point, and direct the manager to the office.  There, the manager would be forced to open the safe and hand over the contents.  After the money was taken, the perpetrators would attempt to find and take the recording system for the surveillance cameras.  ECF Doc. 15-2 at 607-09.

The main issue at trial was one of identification.  None of the victims could identify Cole by sight or voice as one of the perpetrators.  However, the State introduced the following evidence implicating Cole.

1.   <u>Testimony Regarding Reference to Cole's Nickname During the Robberies and of Cole's Involvement by Co-Conspirators</u>

Victim Lakicia Hunter testified one of the perpetrators called another one "MJ" during the June 26, 2008 Dollar Tree robbery.  She testified "later on when he took us to my back stockroom … the guy that had the gun on me brought me in, he said, 'MJ, they got cameras in here.'"  ECF Doc. 15-2 at 161.  Co-conspirator, Lyndon Williams, testified "everyone calls" Cole "MJ." *Id.* at 170.  Co-conspirator,

Carroll, testified Cole had a nickname he went by, "MJ", based on Cole being a pretty good basketball player. *Id.* at 346.

Williams also testified he participated in the Dollar Tree robbery on June 26, 2008 with Cole, Carroll and William Witherspoon. *Id.* at 170. Cole, who Williams called "MJ", went inside the Dollar Tree with Witherspoon, who Williams testified had his real gun with him. *Id.* at 185. Williams testified he was the lookout man and Carroll was the driver. *Id.* at 172. After a while, Carroll became nervous and drove off with Williams, leaving Cole and Witherspoon without a getaway car. *Id.* at 174. Williams testified Witherspoon had dreadlocks. *Id.* at 169.

Carroll testified he was involved with Cole in seven of the eight robberies. *Id.* at 341-403. Carroll met Keel while playing basketball, and Keel introduced him to Cole. They told Carroll about the first Harvey's robbery (in October of 2007), which resulted in tens of thousands of stolen cash, and recruited Carroll to participate in a second robbery of the same Harvey's (in April of 2008) they were planning. Carroll worked at Harvey's at the time.

During the second Harvey's robbery on April 3, 2008, Carroll agreed to lure the manager, Rodney Cull, to the back of the store, where Keel and Cole were waiting. Keel jumped Cull and a scuffle ensued. *Id.* at 347-49. Keel forced Cull back into the corner of the trash compactor area and Cull gave up "trying to move anymore." *Id.* at 41 (Cull's testimony). Cole, meanwhile, took Carroll to another area and zip-tied his wrists to disguise the fact he was involved. *Id.* at 346. Cole

and Keel also zip-tied another employee, Susan Self, who was not in on the robbery. Keel and Cole were not able to get any money out of the safe, and Carroll was left behind and lied to police that he had been a victim of robbery. *Id.* at 29-57.

Carroll also testified he and Cole participated in a Walgreens robbery on June 23, 2008. *Id.* at 349-53. Reggie Chatman suggested the location because his girlfriend, Terenika Watson, worked there. She gave them the codes to the manager's office. Carroll and Keel went inside the Walgreens, and Cole was the getaway driver and lookout man. Carroll was armed with a BB gun that he testified they all shared and used in several of the robberies. It was black and silver, and Carroll believed it belonged to Cole. Keel was armed with an actual gun.

Upon entering, Keel secured cashier Ericka Williams while Carroll went to the office to get cash out of the safe. The office door was locked, but Carroll knew the code from Watson. When he entered, the manager, Tommy Moore, was hanging up the phone, having called 911. Carroll hit Moore with the BB gun and, spooked by Moore being on the phone, left without taking any money.

Carroll testified about participating in the Dollar Tree robbery on June 26, 2008 with Cole, Lyndon Williams and William Witherspoon. *Id.* at 353-58. His description of the robbery matched the testimony of Lyndon Williams, discussed above. Carroll was the driver, Williams was the lookout man, and Cole and Witherspoon went into the Dollar Tree. Witherspoon had "a real gun" with him when he went into the Dollar Tree. *Id.* at 355. Carroll and Williams left before

picking up Cole and Witherspoon because Carroll "got a little worried because it was taking too long." *Id.*

Carroll and Williams's testimonies about the Dollar Tree robbery matched the victim's. *Id.* at 157-67. Hunter testified she was assistant manager that night and was working with Sheneika Lowe, Jack Woodrum and Felicia Thompson. At closing time, as Hunter unlocked the door to let Woodrum out to smoke, two black males in their early 20s with black clothing and their faces covered pushed open the door and forced everyone inside. One of the males had dreadlocks (a description used for Witherspoon). Also, one was wearing a black ski mask. Both had handguns that appeared real. They forced the employees to lie down, except Hunter. One of the males led Hunter to the office where he forced her to open the safe and took the money that was inside. Hunter testified one of the robbers called the other "MJ" and warned that the stores had cameras. *Id.* at 161. The other perpetrator ran with Hunter to the front and took the surveillance system main unit and left.

Carroll also testified about the Family Dollar robbery on June 25, 2008. *Id.* at 358-62. Cole and Keel went into the Family Dollar while Carroll was the getaway driver. Carroll testified he thought that Keel used a BB gun during the robbery. Carroll testified money was obtained during the robbery. Carroll's testimony about the Family Dollar robbery matched that of victims Nicole Arnett and Maggie Richardson. *Id.* at 56-86.

Richardson testified she was working at Family Dollar at the time of the robbery, having just locked the doors because she believed all the customers where gone. She heard a scream from Arnett who was in the stockroom where the bathrooms were. When Richardson turned, she encountered a black male in his early 20s wearing gloves, a hood, hat, face mask and carrying a gun. Moments later, Arnett was led out of the stock room by another similarly attired black male; her wrists were bound with duct tape and her mouth was covered with duct tape. Richardson was forced to open the safe and give the robbers the money inside it. After getting the money, the robbers attempted to get the surveillance tape out of the machine but could not, so they ripped the entire system out, took it, and left. During her 911 call, Richardson stated that the robbers had two guns.

Arnett testified, *id.* at 76-86, she was surprised in the stockroom by a black man in his late 20s wearing a mask and holding a gun. He demanded her cellphone and then left for a moment. He came back, bound and gagged her with duct tape and led her to the front where another black male in a mask and holding a gun was forcing Richardson to open the safe. Arnett also testified the men took the surveillance system after they could not get the tape to come out.

Carroll also testified about the Walgreens / George Rizkalla robbery on June 29-30, 2008. *Id.* at 362-70. Keel worked near the Walgreens and noticed Rizkalla, the manager, seemed like he could be an easy target. Keel, Cole, Chatman and Carroll followed Rizkalla home after Rizkalla closed Walgreens. Cole tackled

Rizkalla when Rizkalla got out of his vehicle, and he and Chatman forced Rizkalla into the backseat of Rizkalla's vehicle. They demanded Rizkalla's keys (including the Walgreens key) and drove to the rear of Carroll's apartment's parking lot, which was near Walgreens. There, they took Rizkalla's cellphone and wallet and forced him to tell them the alarm code and safe code for Walgreens.

Keel and Chatman then took turns walking over to and entering the Walgreens and attempting to the open the safe. The person in the Walgreens was in contact by cellphone with Cole, who remained with Rizkalla to make sure he was giving the correct combination information. The attempts failed, and they proceeded to Cole's residence where they took Rizkalla's ATM card and forced him to give them the pin number. They withdrew the maximum, $500, and forced Rizkalla to give them his apartment number. Cole, Keel and Chatman went to Rizkalla's apartment and stole various items, including a laptop and cable modem.

Carroll's testimony was consistent with Rizkalla's testimony, although Rizkalla added several details. *Id.* at 191-213. The person who tackled him when he first got out of his vehicle also hit him in the head several times. Once Rizkalla was forced into the back of his own truck, a t-shirt was placed over his head to prevent him from seeing anything. Later, Keel unsuccessfully tried to use the safe combination given by Rizkalla and told the driver by cellphone that the combination was not working. The driver directed the other perpetrator to put the gun in

Rizkalla's mouth. When he did, the driver asked, "You think we playing here?" *Id.* at 200.

The safe would not open, and Rizkalla was taken to another apartment where he was bound with duct tape and the t-shirt was taped over his head. Two assailants took Rizkalla's debit card while one waited with him communicating by cellphone with the others. After that, they took Rizkalla back to his apartment complex in his truck, demanded his apartment number and robbed his apartment. One of the items they took was a checkbook to Rizkalla's account. When they returned to the truck one of them beat Rizkalla in the face, scarring his chin. They told Rizkalla not to call the police and left. Rizkalla eventually freed himself from the duct tape and called the police.

Carroll testified about the Dollar General robbery on August 4, 2008. *Id.* at 370-72. Cole, Carroll and Keel cased the store before doing the job, even following the manager of the store home from work one day. On the day of the robbery, Cole laid down outside the store before it opened, pretending to be asleep. When the manager came to open the store, Cole was to jump up right when the door was unlocked. The manager moved too quickly for that and made it into the store and locked the door. Moments later, however, she opened the door back up, and Cole managed to quickly get to the door and get inside. All three went in and the manager quickly gave them the money and told them to leave.

Carroll's testimony was consistent with that of the manager, Terry McKeever. *Id.* at 313-22. McKeever also added that the first person to rush in when she unlocked the door was the same person who was lying down outside and that he had a black and silver gun. He took her to the office and two other men joined them. All were wearing ski masks and had guns. She was told to get the money out of the safe and gave it to them. They told her to stay in the office or they would shoot her and left.

Carroll also testified about a robbery at Dollar General on August 25, 2008. *Id.* at 372-76. Carroll was the driver and lookout man for that robbery, while Keel and Cole went inside the store. They carried the BB gun during the robbery. They were able to get money from the robbery, and Carroll drove them away.

Carroll's testimony is consistent with that of Hellon Ford, an employee of Dollar General. *Id.* at 322-30. Ford was working the morning of August 25, when two men who sounded like black men in their 20s came into the room with guns. They made Ford and an employee Ford testified was not the manager and was named "Michelle" go back to the office.[3] There, they bound Ford with duct tape and forced the other employee to open the safe. They got money from the safe and then tried to break open the security camera console but could not. When they could not, they

---

[3] Ford appears to have been mistaken about the name of her co-worker that day because Deputy Donnie Jackson testified when he arrived on the scene, he found two employees at the store, Ford and a Caroline Mills. *Id.* at 331-35.

took the whole security console with them. They told Ford to stay in the office and left.

### 2.    Physical Evidence Implicating Cole

In addition to the testimonies provided by co-conspirators and victims, the State also introduced DNA evidence tying Cole to the robberies. The evidence was found on the following items: (1) a gray hat found at the scene of the Family Dollar robbery on June 25, 2008, which Carroll testified belonged to him, but was worn by Cole during some of the robberies (*Id.* at 88); (*Id.* at 361-62); (2) a brown glove found by Officer Michael Martin in the parking lot of Rizkalla's apartment complex (*Id.* at 225); (3) a black t-shirt Rizkalla testified was taped over his head, which was found in the back of Rizkalla's truck (*Id.* at 233); and (4) a black ski mask, which was found underneath the driver's seat of the car when investigators searched Chatman's girlfriend's car. *Id.* at 246.

DNA expert Suzanne Livingston tested the gray hat and testified the hat contained a DNA profile which excluded 99.65% of African-Americans but did not exclude Cole. *Id.* at 111-13. DNA expert Chris Bacot tested the black ski mask, brown glove and t-shirt and found a profile on each that excluded 99 percent of African-Americans but did not exclude Cole. *Id.* at 259-60.

Investigators also searched Keel's black Dodge Charger and found a checkbook with Rizkalla's personal information on it, a silver and black BB gun matching the description given by several victims, and $1,259 in cash. *Id.* at 234-

41.  At the time investigators found the ski mask under the driver's seat of Chatman's girlfriend's car, they also found a Raven .25 caliber pistol in the same spot.  *Id.* at 246.

The State also offered cell phone connection data to implicate Cole.  Sergeant Christopher Corbitt testified he examined the historical cell phone records of the suspects in the robberies and was able to use them to track their calls and movements during the times of the various robberies.  ECF Doc. 15-2 at 405-36.  For example, he analyzed the cell phone records of Keel, Carroll, Cole and Chatman during the June 29-30, 2008 Rizkalla robbery and kidnapping.  He testified the records show frequent cell phone communication between all four during that time.  Maps of the cell towers to which each connected showed that each moved toward the cell tower that covered Carroll's apartment, the Chili's where Rizkalla went immediately after work, and the Walgreens which was the target of the Rizkalla kidnapping and robbery.

The records also showed the perpetrators moved to the cell area which included Rizkalla's apartment and then back to the cell area which covered Carroll's apartment and the Walgreens.  After that, Carroll only contacted the tower near his apartment.  The others, however, contacted a series of towers that showed they drove west to the cell area that included Cole's apartment and then, hours later, back to the cell area that included Rizkalla's apartment.  These movements are consistent with Carroll and Rizkalla's testimonies.

Corbitt also testified about the June 25, 2008, robbery of Family Dollar. ECF Doc. 15-2 at 424. Using the same cell phone data techniques, he demonstrated that Keel, Cole and Carroll communicated by cell phone frequently, but that Chatman did not (he was not involved in this robbery according to Carroll). The map he showed the jury contained a cluster of calls made in the cell area covering Carroll's apartment followed by a cluster of calls made in the cell area covering the Family Dollar.

Lastly, Corbitt testified about the June 23, 2008, robbery of another Walgreens, this one on North Monroe Street. *Id.* at 430-32. The data showed that Keel, Chatman, Cole and Terineka Watson, Chatman's girlfriend who worked at the Walgreens, communicated with each other frequently during the time of the robbery. Also, the map shown to the jury included a cluster of calls at the time of the robbery from all four from a cell area that included the Walgreens on North Monroe Street.

## C.    Procedural Background

### 1.    Verdict and Sentence

On May 17, 2012, Cole was found guilty on 28 counts and not guilty on four. ECF Doc. 15-1 at 159. Also, for most of the counts containing a specific enhancement question (such as whether a firearm or weapon was used) the jury answered "Yes" but answered "No" in five instances.

Specifically, the jury found Cole guilty of racketeering and conspiracy to racketeer (Counts 1 and 2). They found him **<u>not</u>** guilty of kidnapping, robbing or

battering Cull during the first Harvey's Robbery (Count 3-5).  As to the second Harvey's robbery, they found Cole guilty of kidnapping Cull and Self in Counts 6 and 7, but that no weapon was used in those crimes.  However, in Count 8, they found that Cole committed attempted robbery with a deadly weapon during the second robbery at Harvey's.

As to the June 23, 2008 Walgreens robbery, the jury found that Cole kidnapped cashier Williams and manager Moore, but that no weapon was used (Counts 9 and 10).  However, the jury found that Cole committed attempted robbery with a deadly weapon (Count 11) and aggravated battery with a firearm on Moore (Count 12).  The information for Counts 11 and 12 alleged that Cole actually possessed a firearm, but the verdict asked the jury whether Cole committed "Attempted Robbery with Deadly Weapon" and "Aggravated Battery with Firearm". *Compare* ECF Doc. 15-1 at 25 *with id.* at 163-64.

As to the June 25, 2008 Family Dollar Robbery, the jury found that Cole kidnapped Arnett and Richardson with a weapon (Counts 13 and 14) and robbed the store with a deadly weapon (Count 15).  As to the June 26, 2008 Dollar Tree Robbery, the jury found that Cole kidnapped Hunter, Woodrum, Thompson and Lowe with a weapon (Counts 16-19) and robbed the store with a deadly weapon (Count 20).

As to the Rizkalla / Walgreens incident on June 29-30, 2008, the jury found that Cole kidnapped Rizkalla but did not use a weapon (Count 21).  However, they

found Cole had robbed Rizkalla of his keys, cellphone and wallet with a deadly weapon. (Count 22). They found that Cole was guilty of aggravated battery on Rizkalla through the scarring of Rizkalla's chin. (Count 23). The jury found Cole guilty of aggravated battery with a firearm for the placement of the gun in Rizkalla's mouth (Count 24); guilty of the burglary of Rizkalla's dwelling and the Walgreens (Counts 25 and 26); and guilty of attempted robbery of Walgreens with a firearm (Count 27).

As to the August 4, 2008 Dollar General robbery, the jury found Cole guilty of kidnapping using a weapon (Count 28) and robbery with a deadly weapon (Count 29). Finally, as to the August 25, 2008 Dollar General robbery, the jury found Cole **<u>not</u>** guilty of kidnapping Caroline Miles but guilty of kidnapping Ford with a weapon and robbery with a deadly weapon.

Cole was sentenced immediately after trial, on May 17, 2012. ECF Doc. 15-2 at 666; ECF Doc 1 at 180-91. For the racketeering and conspiracy to commit racketeering charges, (Counts 1 and 2), he received two 30-year sentences, to be served consecutively. For counts 8 (attempted robbery with a deadly weapon), 11 (attempted robbery with a deadly weapon), 12 (aggravated battery with a firearm), 23 (aggravated battery with great bodily harm), 24 (aggravated battery with a firearm), 25 (burglary of a dwelling) and 27 (attempted robbery with a firearm), Petitioner received 15-year sentences. Counts 8, 11, 12 and 13 were to be served consecutively to each other (i.e., a total of 60 years) but concurrent to the 60-year

total for the racketeering sentences.  For Count 26, burglary of a structure, Petitioner was sentenced to 5 years in prison, consecutive to the 15-year sentences in counts 24, 25 and 27, but concurrent to the 60 years total in counts 1, 2, 8, 11, 12, and 23. For the 13 kidnapping convictions (Counts 6, 7, 9, 10, 13, 14, 16, 17, 18, 19, 21, 28, and 31) and the five robbery-with-a-deadly-weapon convictions, Petitioner was sentenced to 60 years in prison, all concurrent with each other and with all other charges.  All sentences were to be served concurrently with any sentences imposed in separate cases in Wakulla County.

### 2.    Postconviction History

Cole filed a notice of appeal on June 18, 2012, ECF Doc. 15-1 at 194.  The First DCA affirmed *per curiam* and without written opinion on June 23, 2014.[4]  ECF Doc. 15-6.  Cole filed a motion for postconviction relief on March 20, 2015.  ECF Doc. 15-7 at 4.  On July 7, 2016, the state court summarily denied eleven of the fifteen claims and set the remaining four for an evidentiary hearing.  *Id.* at 63.  The evidentiary hearing was held on November 22, 2016, and trial counsel was the only witness.  *Id.* at 312-51 (transcript).  The state court denied the motion as to the four remaining claims in open court on November 22, 2016 and in writing on November 23, 2106.  *Id.* at 303.  Cole appealed the denial of his 3.850 motion on December 19,

---

[4] Judges Wolf, Padovano and Ray concurred.

2016. *Id.* at 304. The First DCA affirmed *per curiam* and without written opinion on November 29, 2017.[5] ECF Doc. 15-10.

## II.    TIMELINESS

Cole's petition is timely filed because it was filed within one year of the judgment at issue being final, including periods of time when the limitations period was tolled by the filing of a Rule 3.850 motion or state habeas petition. 28 U.S.C. § 2244(d)(1), (2); ECF Doc. 15 at 26. Cole's judgment became final on September 21, 2014, ninety (90) days after the First DCA affirmed the judgment on direct appeal. *See Chavers v. Sec'y, Fla. Dep't of Corr.*, 468 F.3d 1273, 1275 (11th Cir. 2006) ("the entry of judgment, and not the issuance of the mandate, is the event that starts the running of time for seeking Supreme Court review, within the meaning of Supreme Court Rule 13.3 and 28 U.S.C. § 2244(d)(1)(A)"). Cole filed his 3.850 motion on March 20, 2015, 180 days later, tolling his limitations period. That motion tolled Cole's limitations period for filing his federal habeas petition until December 27, 2017, when the First DCA issued its mandate affirming the denial of his petition for writ of habeas corpus. Thereafter, the one-year limitations period commenced running again and continued to do so for 39 days until February 4, 2018, when Cole filed the instant federal petition. Because only 219 days of his limitations period under the AEDPA had run, Cole's petition is timely.

---

[5] Judges Roberts, Bilbrey and Kelsey concurred.

## III.   LEGAL STANDARDS

### A.     Federal review of state court decision

Under the standard of review for a § 2254 motion, this Court is precluded from granting habeas relief unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

The United States Supreme Court set forth the framework for a § 2254 review in *Williams v. Taylor*, 529 U.S. 362 (2000).  *See id.*, at 412-13 (O'Connor, J., concurring).  Under the *Williams* framework, a federal court must first determine the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  *See Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).  The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue.  *See Thaler v. Haynes*, 559 U.S. 43, 47 (2010).  Once the governing legal principle is identified, the federal court must determine whether the state court's adjudication is "contrary to" the identified governing legal principle or the state court "unreasonably applie[d] that principle to the facts of the … case."  *See Williams*, 529 U.S. at 412-13 (O'Connor, J., concurring).  Even if a federal court concludes the state court applied federal law

incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable." *See Maharaj v. Sec'y Dep't of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005).

Finally, in determining whether the state court's decision "was an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," the state court's determination of factual issues is presumed correct. *See Parker v. Head,* 244 F.3d 831, 835 (11th Cir. 2001). The burden is on the petitioner to rebut that presumption of correctness by clear and convincing evidence. *See id.* at 835-36; 28 U.S.C. § 2254(e)(1); *see also*, *Siplen v. Sec'y, Fla. Dept. of Corr.*, 649 F. App'x 809, 811 (11th Cir. 2016). Additionally, this Court must accept the state court's credibility determinations. *See Baldwin v. Johnson,* 152 F.3d 1304, 1316 (11th Cir. 1998) ("We must accept the state court's credibility determination and thus credit [counsels'] testimony over [petitioner's].."); *see also, Consalvo v. Sec'y for Dept. of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011) ("[d]etermining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review").

### B.    Standards for an Ineffective Assistance of Counsel Claim

A claim of ineffective assistance of counsel requires a showing that (1) counsel's performance during representation fell below an objective standard of reasonableness, and (2) prejudice resulted, *i.e.*, a reasonable probability exists that but for counsel's unprofessional conduct, the result of the proceeding would have

been different.  *Strickland v. Washington*, 466 U.S. 668, 689 (1984).  The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential.  *Id.* at 689.  The defendant bears the burden of proving that counsel's performance was unreasonable under prevailing professional norms and that the challenged action was not sound strategy.  *Id.* at 688-89

*Strickland*'s prejudice prong requires a petitioner to allege more than simply that counsel's conduct might have had "some conceivable effect on the outcome of the proceeding."  *Strickland*, 466 U.S. at 693.  The petitioner must show a reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  Bare allegations that the petitioner was prejudiced by counsel's performance are not enough.  *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987).

## IV.   ANALYSIS[6]

### A.   Ground One: Ineffective Assistance of Trial Counsel ("IATC") for failing to move for arrest of judgment due to inconsistent verdicts

In this ground Cole argues his counsel was ineffective for failing to move for an arrest of judgment based on the verdicts on three of the robberies being "legally

---

[6] Other than as specifically discussed herein, the State does not dispute that Petitioner's claims have been exhausted.

inconsistent." ECF Doc. 1 at 3-4. Specifically, he notes that the jury in Counts 6 and 7 found that, during the second Harvey's robbery, Cull and Self were kidnapped but that no weapon was used, while in Count 8 they found that Cull and Harvey's Supermarket were robbed with a deadly weapon. Second, the jury found that in the first Walgreens robbery Cole kidnapped Williams and Moore without a weapon (Counts 9 and 10), but Cole robbed Moore and Walgreens with a deadly weapon and battered Moore with a deadly weapon (Counts 11 and 12). Third, he argues in the Rizkalla robbery, the jury found Cole kidnapped Rizkalla without a weapon (Count 21) while at the same time found Cole robbed Rizkalla of his keys, cellphone and wallet with a deadly weapon (Count 22), committed aggravated battery against him (Count 23), battered him with a firearm (Count 24) and attempted to rob Rizkalla and Walgreens with a firearm (Count 27). Thus, Cole argues it is legally inconsistent for the jury to find Cole did not use a weapon for some offenses, but finding he did for other offenses involving the same robbery.

Because the First District issued a *per curiam* affirmance of the denial of Cole's Rule 3.850 Motion, this Court will "look through" that decision to the last related state-court decision that provides a relevant rationale and presume that the unexplained decision adopted the same reasoning. *See Wilson*, 138 S. Ct. at 1192. Here, that last decision comes from the order denying Cole's motion for postconviction relief. ECF Doc 15-7 at 63.

The state judge applied the *Strickland* standard and summarily denied relief on this ground finding that, "as a general rule factually inconsistent verdicts are permitted in Florida" unless "the charges are legally interlocking such that 'an acquittal of the underlying felony effectively holds the defendant innocent of a greater offense involving that same felony,'" which was not the case in Cole's situation." ECF Doc. 15-7 at 64. This finding is reasonable and is supported by the record.

First, sufficient evidence supports the verdict that a weapon was used in the robberies and batteries on which Cole was convicted (Counts 8, 11, 12, 22, 23, 24 and 27). In the second Harvey's robbery (Counts 6-8), Cull testified he heard one of the robbers say to the man with whom he was struggling, "shoot him." ECF Doc. 15-2 at 42. Thus, circumstantial evidence existed for the jury to conclude a firearm was present. *See, e.g., T. T. v. State*, 459 So. 2d 471, 472 (Fla. 1st DCA 1984) (defendant held an object that appeared to be a gun and threatened to "blow your brains out"); *Smith v. State*, 645 So. 2d 124, 125-26 (Fla. 1st DCA 1994) (defendant held an unseen object with "some sort of point" to victim's neck and threatened "shut up or I will kill you").

Similarly, Carroll testified that in the first robbery of a Walgreens (Counts 9-11), Keel was carrying a gun. ECF Doc. 15-2 at 351. Thus, there was evidence to convict Cole, as a principal, to attempted robbery with a deadly weapon. As to the kidnapping, beating, robbery and burglary of Rizkalla, and the failed attempt to open

the safe at the Walgreens, Rizkalla testified that after he had been placed into the back of his truck, one of his assailants held his head and a gun was put in his mouth. That is sufficient evidence to support the guilty verdict of kidnapping with a weapon in Count 22 and aggravated battery on Count 24.

In Count 23, the jury found that Cole was guilty of aggravated battery, not because of the actual possession of a firearm, but because the beating permanently scarred the victim's chin. Thus, the presence of a gun is immaterial. Finally, as to Count 27, Rizkalla testified the perpetrators threatened him with a gun, including placing it in his mouth, to compel him to give them the codes to open the Walgreen's safe. This is sufficient to support the guilty verdict on Count 27 for attempted armed robbery with a deadly weapon.

As to the fact that Cole was not convicted on related counts, the state court was not unreasonable in finding the jury's verdicts did not require an arrest of judgment. Factually inconsistent verdicts are permitted under Florida and federal law. Inconsistent jury verdicts are permitted in Florida "because they can be the result of jury lenity, and therefore do not always speak to the guilt or innocence of the defendant." *Gonzalez v. State*, 841 So. 2d 650, 651 (Fla. Dist. Ct. App. 2003); *Fayson v. State*, 698 So.2d 825, 826-27 (Fla.1997).

Similarly, federal courts have held that the rendering of inconsistent verdicts has always been an exclusive privilege and prerogative of the jury, and it is not the duty of the court to "unravel the ratiocinations of the jury's collective logic." *Odom*

*v. United States*, 377 F.2d 853, 857 (5th Cir. 1967).[7]  Nor may a court speculate that a verdict may have been the result of compromise, mistake or even carelessness. *United States v. Dotterweich*, 320 U.S. 277, 279 (1943). "Juries may indulge in precisely such motives or vagaries." *Id.*  Thus, a jury's inconsistent verdicts in a criminal case are not a basis for reversal.  *See generally United States v. Wright*, 63 F.3d 1067, 1073-74 (11th Cir.1995).

> **B.    Ground Two: IATC for Failing to Move for Arrest of Judgment for Cole Having Been Found Guilty of Crimes Not Charged in the Amended Information**

Counts 11, 20 and 22 in the Amended Information each charged that Cole "in the course of committing the robbery, carried and did actually possess a firearm during the commission of the offense, contrary to Sections 775.087 and 812.13(2), Florida Statutes."  ECF Doc. 15-1 at 25-26.  The jury instructions for Counts 11, 20 and 22, however, each asked the jury to determine if Cole was guilty of attempted or actual robbery "With Deadly Weapon."  ECF Doc. 15-1 at 163-68.  Because of this difference, Cole argues his counsel should have moved to arrest the judgment on these counts because he "was not charged with having carried a deadly weapon, nor was there any evidence produced to establish such at trial," and use of a deadly

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit before the close of business on September 30, 1981.

weapon is not a permissible lesser included offense of robbery with a firearm.  ECF Doc. 1 at 6.  Cole does not cite any legal authority for this argument.

The Court will again "look through" the First DCA's *per curiam* opinion to the written opinion of the state 3.850 judge on this issue.  The state judge applied *Strickland* and summarily denied relief on this ground finding that, "a deadly weapon is necessarily included within the definition of firearm."  ECF Doc. 15-7 at 64. This explanation, however, fails to address what appears to be the heart of Cole's argument, which is that while a firearm is a deadly weapon, there are deadly weapons that are not firearms.  A knife is an obvious example, but a BB gun is a less obvious one.

Under both federal and Florida law, to be a firearm a device must expel a projectile "by the action of an explosive." 18 U.S.C. § 921(a)(3); Fla. Stat. § 790.001(6).  BB guns, however, expel their projectiles by the sudden release of compressed air, not by an explosion.  *United States v. Ramos*, 762 F. App'x 986, 987 (11th Cir. 2019), *cert. denied*, No. 18-9604, 2019 WL 4922158 (U.S. Oct. 7, 2019) ("a 'BB' or pellet gun … uses air or carbon dioxide pressure to expel a projectile."). Thus, a BB gun "is a dangerous weapon but not a firearm." *Ramos,* 762 F. App'x at 987 (citing U.S.S.G. § 1B1.1, cmt. N.1(G) (2016)); *Dale v. State*, 703 So.2d 1045, 1047 (Fla. 1997) (holding that an unloaded BB gun was found by the jury to be a "deadly weapon").  Thus, reading Cole's argument liberally, he appears to be arguing that by only charging "firearm" in the amended information, the State did

not put him on notice that he could be convicted on evidence that some other deadly weapon was involved.

Since the state court did not address this argument directly, and the First DCA did not offer a written explanation of its decision, there is no written rationale explaining the state courts' decision on this argument. However, in *Harrington v. Richter*, the Court instructed that "where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." 562 U.S. 86, 98 (2011).

Here, the undersigned finds a reasonable basis exists for the First DCA to have rejected this claim. Under Florida law, the court may grant a motion in arrest of judgment only on one or more of the following grounds:

> (a) The indictment or information on which the defendant was tried is so defective that it will not support a judgment of conviction.
> (b) The court is without jurisdiction of the cause.
> (c) The verdict is so uncertain that it does not appear therefrom that the jurors intended to convict the defendant of an offense of which the defendant could be convicted under the indictment or information under which the defendant was tried.
> (d) The defendant was convicted of an offense for which the defendant could not be convicted under the indictment or information under which the defendant was tried.

Fla. R. Crim. P. 3.610. Cole does not argue the Amended Information was defective, merely that it does not match the verdict form; thus, (a) does not apply. He does not claim the court lacks jurisdiction, so (b) does not apply.

As to (c) and (d), Cole could have been "convicted under the indictment or information under which [he] was tried." That is, the statutes charged in the amended information were sections 775.087 and 812.13(2). Section 775.087 allows an enhanced sentence for a robbery if "any weapon or firearm" is used, which includes a deadly weapon. Section 812.13(2) allows an enhanced sentence if, in the course of committing the robbery, the offender carried "a firearm or other deadly weapon." In other words, each statute allows conviction for the enhanced sentence based on a deadly weapon. Thus, the jury could convict Cole of violating the statutory sections listed for using a deadly weapon (regardless of whether the Information identified a firearm), and (c) and (d) do not apply. A motion to arrest judgment would likely have been denied.

Moreover, if this ground is construed as an effort to overturn a conviction based upon a variance between the allegations of the charging document and proof submitted at trial, Cole must show that the record reveals a possibility that the variance resulted in substantial prejudice to Cole, such as inhibiting his ability to present his defense and not be taken by surprise by the evidence offered at trial, or subjecting him to a substantial possibility of new prosecution for the same offense.

*See Thompson v. Nagle*, 118 F3d 1442, 1453 (11th Cir. 1997) (citing *Berger v. United States*, 295 U.S. 78, 82 (1935)).[8]  He has not done so here.

Cole cannot show his preparation of a defense was substantially prejudiced. The parties were on notice that the verdict form did not precisely match the information or the jury instructions.  Additionally, no other type of weapon was referred to in testimony in this case other than a real gun and a BB gun.  Also, Cole's defense in this case was based on a lack of identification.  Namely, that none of the victims could identify him and the only testimony linking him to the crimes was from co-defendants seeking better treatment in their cases.  He did not argue or focus on whether the weapon in certain robberies was a BB-gun rather than a firearm. Thus, his actual defense was not affected by the change in the jury instructions.

For these reasons, Cole has failed to show that no reasonable basis exists for the state courts' denial of this claim and is not entitled to habeas relief.  *See, Richter,* 562 U.S. at 98.

---

[8]  *See also* Florida Rule of Criminal Procedure 3.140(o), which provides: No indictment or information, or any count thereof, shall be dismissed or judgment arrested, or new trial granted on account of any defect in the form of the indictment or information or of misjoinder of offenses or for any cause whatsoever, unless the court shall be of the opinion that the indictment or information is so vague, indistinct, and indefinite as to mislead the accused and embarrass him or her in the preparation of a defense or expose the accused after conviction or acquittal to substantial danger of a new prosecution for the same offense.

**C.    Ground Three: IATC for Failing to Object to Prosecutor Relying on Facts Outside the Record when Opposing Cole's Motion for Judgment of Acquittal on Counts 6-8**

At the end of the testimony in the case, Cole's counsel moved for a judgment of acquittal.  ECF Doc. 15-2 at 505.  With regard to counts 6-8 and the second Harvey's robbery, defense counsel argued "there was no testimony as to whether a weapon was -- a BB gun was used.  At least that's my recollection of the evidence. I don't recall whether Mr. Carroll places a BB gun into the hands of Mr. Cole." *Id.* at 511.  The State responded, "My argument there, Your Honor, was that Mr. Keel and Mr. Cull get into this scuffle. They force Mr. Cull back, I believe he said, toward the trash compactor. And at that point they tie up Ms. Self. At that point Ms. Self sees what's going on, the physical. And she also sees a weapon being brandished." *Id.* at 513.  Self, however, did not testify at trial, and no other statement by her is in the record.

The trial court could not remember if there was testimony from Cull or Carroll about whether a weapon was involved and stated as follows:

> I'm going deny VI, VII and VIII. I think it is a close question on the BB gun. And, frankly, this is one time when the trial court is in a disadvantage trying to go back and recollect very complicated testimony. I guess the record will speak for itself as to exactly what was said.  I think at this point in time I think it is sufficient to go to the jury. And if the record doesn't bear me out, so be it. That's what the transcript will prove up.

ECF Doc. 15-2 at 515.  Cole argues counsel should have objected to the State's implication that Self testified she saw a weapon during the second Harvey's robbery.

The Court will again "look through" the First DCA's *per curiam* opinion to the written opinion of the state 3.850 judge on this issue. The state judge applied *Strickland*, and summarily denied relief on this ground finding that, "Cull testified that the assailants used, what appeared to be, handguns." ECF Doc. 15-7 at 65.

This conclusion is reasonable and supported by the record. Even had the objection been made and sustained, the trial court would still have sent the issue to the jury to recollect what had been stated during the trial. Moreover, Cull's testimony was sufficient to allow the jury to conclude that a weapon was used or threatened during the second Harvey's robbery. Therefore, Cole has not shown any prejudice from the lack of an objection to the reference to Self by the prosecutor.

**D.    Ground Four: IATC for Failing to Move to Suppress Cole's Confession**

Cole argues counsel should have moved to suppress his confession. ECF Doc. 1 at 8. The Court will again "look through" the First DCA's *per curiam* opinion to the written opinion of the state 3.850 judge on this issue. The state judge applied *Strickland* and summarily denied relief on this ground finding that, "the court made a finding that the confession was voluntary, following an extensive proffer of evidence, which included the jail-house interview itself." Thus, there was no prejudice to Cole for his counsel's failure to present such a motion, which would have been denied. ECF Doc. 15-7 at 65.

The finding of no prejudice is reasonable and supported by the record. Indeed, Cole was not prejudiced because his confession was not offered at trial. Although, the trial court determined the confession was admissible (ECF Doc. 15-2 at 487), the prosecutor opted not to introduce the confession. *Id.* at 487. Moreover, the prosecutor questioned Suleski about Carroll's interview but did not mention the statement by Cole. Since the confession was not introduced at trial, a motion to suppress was unnecessary and the failure to file one could not have been prejudicial.

### E.    Ground Five: IATC for Failing to Move for a Judgment of Acquittal on the Kidnapping Counts

Cole argues counsel should have moved for acquittal because the State's evidence failed to prove Cole confined the victims or intended to terrorize them in Counts 6, 7, 9, 10, 13, 14, 16-19, 28 and 31.

The Court will again "look through" the First DCA's *per curiam* opinion to the written opinion of the state 3.850 judge on this issue. The state judge applied *Strickland* and summarily denied relief finding that, "there was sufficient evidence to overcome a JOA motion. The jury could have inferred from the testimony that Ms. Self was tied up with zip-ties and left on the floor, that Defendant had the intent to terrorize. *Id.* The same holds for the remainder of the kidnapping counts, which Defendant contends failed to establish intent to terrorize." ECF Doc. 15-7 at 65-66. This conclusion is reasonable and supported by the record.

Florida Statutes § 787.01 (1)(a) provides as follows:

The term "kidnapping" means forcibly, secretly, or by threat confining, abducting, or imprisoning another person against her or his will and without lawful authority, with intent to:

1. Hold for ransom or reward or as a shield or hostage.
2. Commit or facilitate commission of any felony.
3. Inflict bodily harm upon or to terrorize the victim or another person.
4. Interfere with the performance of any governmental or political function.

Here, sufficient evidence was presented to the jury to allow the jury to find both confinement and an intent to terrorize the victims.

Counts 6 and 7 involved Cull and Self during the first Harvey's robbery. Cull testified he was confined to the corner of the compactor area and that "I felt like they might have been holding me all the way up to when [Carroll] … walked up to me." ECF Doc. 15-2 at 46. He testified the perpetrators were holding Self against her will as well. *Id.* at 47. Counts 9-10 involved Moore and Williams during the first Walgreens robbery. Moore testified that one of the perpetrators hit him in the head with the gun and ordered him to open the safe. *Id.* at 126. The jury was entitled to believe Moore was not free to leave at that time. Second, Ericka Williams testified the perpetrator "told me to stay still, tied my hands behind my back." *Id.* at 307.

Counts 13-14 involved Maggie Richardson and Nicole Arnett and the Family Dollar robbery. Richardson testified while she was working with Nicole Arnett, one of the perpetrators had forced Richardson to go to the safe and open it. Also, she testified that, "[a]fter they had taken the money, they made the both of us go back in

our office, unlock the office and went in, and shoved us up underneath the counter space back there and told us not to come out." *Id.* at 63. This testimony, along with much more, was sufficient to allow the jury to find that Richardson and Arnett were confined.

Counts 16-19 involved Hunter, Woodrum, Thompson and Lowe and the Dollar Tree robbery. Hunter testified, "As soon as they met me at the door, they said, get back in there; get back in there. And then we all kind of backed up. And then the guy that had the ski mask thing on his face, he pointed the gun at the others and told them to lay down." *Id.* at 160-61. This testimony is sufficient to support the jury's finding that all four victims were confined.

Count 28 involved Terry McKeever and the August 4 Dollar General robbery. McKeever testified that after a perpetrator burst into the store with a gun, "well, he told me to take him to the to my office. Well, actually, he, like, said, let's go, and he brought me back to my office." *Id.* at 318. This evidence supports the jury's determination that the victim was confined.

Finally, Count 31 involved Hellon Ford and the August 25 Dollar General robbery. Ford testified that after two masked men burst into the store with guns, she was taken to the office and her hands were bound behind her back. *Id.* at 325-36. She was told to stay there after they left and answered "yes" to this question: "It sounds silly, but when you're being bound up with duct tape, were you being held against your will at that point?" *Id.* at 327.

Additionally, all the witnesses testified they were afraid for their life when armed, masked men burst into their workplaces, threatened to kill them and bound them with zip-ties.  For example, Ford spontaneously started reciting Psalm 23, and Nicole Arnett urinated on herself because she was so scared.  The victims also testified that the perpetrators bound and threatened them to convince them to open safes.  The jury could reasonably infer that the perpetrators confined and threatened the victims with intent to terrorize them into giving up the safe combinations or simply opening the safes for the perpetrators.

For these reasons, moving for a judgment of acquittal on the basis suggested in this ground would have been futile.  An attorney cannot be deemed ineffective for failing to raise claims that are "reasonably considered to be without merit."  *United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000) (quotation omitted).  The state court's decision on this ground was therefore not contrary to, and did not involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.  28 U.S.C. § 2254(d).

### F.    Grounds Six: IATC for Failing to Object to Prosecutor's Improper Comments in Opening and Closing Statement That Shifted the Burden of Proof

Cole argues the prosecutor made two improper statements, which together shifted the burden of proof.  First, at the end of his opening statement, the prosecutor said the following:

> Ladies and gentlemen, once you hear about the sheer number of victims in this case, the sheer number of law enforcement hours spent trying to catch these men, and the breadth of this crime spree throughout the county, the State is confident that you will find Mr. Cole is guilty as charged on every single one of the counts the State has brought. Thank you.

ECF Doc. 15-2 at 25. Cole argues this shifted the burden from finding Cole guilty only if the proof of guilt was beyond a reasonable doubt to "find[ing] him guilty based on the number of victims, the effort put forth by law enforcement, and the length of the crime spree." ECF Doc. 1 at 14.

Second, in the State's rebuttal closing argument, the prosecutor stated the following:

> Here is kind of the big problem for Korey Cole. Here is his major problem. You've heard from Mr. Hobbs that essentially it was either implied or said that Cory Carroll is guilty, but Korey Cole is not. At least we don't know if Korey Cole is. Well, Korey Cole's problem is if Cory Carroll is guilty, he is, too. There is no reasonable explanation. There is no reasonable interpretation of the facts in which Cory Carroll is guilty but Korey Cole isn't. . . .  There is really no reasonable interpretation of the facts in which Carroll is guilty and Cole isn't, And Carroll is guilty. Carroll is guilty as sin.

*Id.* at 639-40.  Cole argues those comments shifted the burden because they "effectively placed the prestige of the government behind a verdict finding of guilt regardless of whether the elements of the offenses were met beyond a reasonable doubt." ECF Doc. 1 at 15.

1.    <u>Cole "fairly presented" this ground to the state courts</u>

The State argues Cole did not exhaust the entirety of this claim in state court because he relies on different comments than those that were at issue in his 3.850 motion. The undersigned disagrees and finds Cole fairly presented the arguments in this Ground to the state court, although not in one place.

A petitioner is required to present his claims to the state courts such that the courts have the "opportunity to apply controlling legal principles to the facts bearing upon [his] constitutional claim." *Picard v. Connor*, 404 U.S. 270, 275–77 (1971). To satisfy this requirement, "[a] petitioner must alert state courts to any federal claims to allow the state courts an opportunity to review and correct the claimed violations of his federal rights." *Jimenez v. Fla. Dep't of Corr.*, 481 F.3d 1337 (11th Cir. 2007). A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. *Martinez v. Ryan*, 566 U.S. 1, 10.

In Grounds Eight, Nine and Eleven of Cole's 3.850 motion, Cole fairly presented the two claims of improper burden shifting raised in Ground Six of his federal petition. First, in Ground Eleven of the 3.850 motion Cole claimed IATC for failing to object to the State's improper comments in opening statement regarding the sheer number of victims, hours of law enforcement time spent and breadth of the crime spree. ECF Doc. 15-7 at 39.

Second, in Grounds Eight and Nine of his state 3.850 motion, Cole fairly presented the arguments of burden shifting based on Carroll's confession. In Ground Eight, Cole quoted the salient parts of the prosecutor's comments in closing and argued, "Defense counsel should have objected to the State's contention that Defendant was as guilty as Cory Carroll, and either requested a curative instruction that instructed the jury that they should not consider the guilt of Cory Carroll as proving the guilt of Defendant." ECF Doc. 15-7 at 35. Also, in Ground Nine of the 3.850 motion, Cole addressed the rebuttal closing statements. There, after arguing that Sergeant Suleski's testimony about Cole's confession improperly bolstered Cole's credibility, Cole argued the comments in closing also constituted improper burden shifting: "Magnifying the issue above, the State argued in closing arguments that if the jury found that Cory Carroll was guilty then there was no reasonable determination that would leave Defendant not guilty." ECF Doc. 15-7 at 37. This presented the issue of the comments shifting the burden from "beyond a reasonable doubt" to "if Carroll was guilty … then there is no reasonable determination that would leave Defendant not guilty."

Although Ground Nine of the state 3.850 motion dealt with improper bolstering of Carroll's testimony, and not with the putative shifting of the evidentiary burden by the prosecutor, Ground Eleven of the state 3.850 motion addressed that issue. Thus, although he did not do so all in one place, Cole did fairly present both the claims in this Ground to the state courts.

2.  <u>Cole cannot show prejudice under *Strickland* or the "cause and prejudice"
    or "actual innocence" exceptions</u>

As to the first part of this Ground – the claim involving the statement in the
prosecutor's opening -- this was raised in Ground Eleven below.  The state 3.850
judge applied *Strickland* to and rejected the claim, finding the "State's opening
statement was within the bounds of proper argument," and "Defendant cannot show
prejudice or deficient performance."  ECF Doc. 15-7 at 67.

As to the argument in Grounds Eight and Nine in the 3.850 motion --
involving the burden-shifting in the statement's about Carroll's guilt in rebuttal
closing -- the state court first denied Ground Eight summarily and then held an
evidentiary hearing on Ground Nine.  For Ground Eight, the state court reasoned
"Defendant cannot show deficient performance as these comments were within the
latitude given for closing argument."  *Id.* at 66.

At the end of the evidentiary hearing, the state court denied relief on Ground
Nine in open court.[9]  ECF Doc. 15-7 at 348.  The 3.850 judge, who was also the trial
judge, first noted that he would not have granted a mistrial based on the comments
about Carroll.  The court found that the prosecutor's actions were not objectionable,
and that, since the prosecutor was "pretty carefully limited" and did not go "too far",

---

[9] The state court's initial order denying some of Cole's 3.850 claims, ECF Doc. 15-7 at 63, set
several claims, including Ground Nine, for evidentiary hearing.  The state court denied the claims
with explanation at the end of the evidentiary hearing.  ECF Doc. 15-7 at 312.  After the evidentiary
hearing, the state court entered a written order denying those claims, "based on the reasons
announced on the record" at the end of the evidentiary hearing.  ECF Doc. 15-7 at 303.

defense counsel's conduct was not deficient for failing to object to it. ECF Doc. 15-7 at 349.

Under Florida and federal law, "attorneys are given wide latitude during closing argument 'to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence.'" *Owens v. Sec'y, Fla. Dep't of Corr.*, No. 3:16-CV-889-J-39JRK, 2018 WL 1535721, at *5 (M.D. Fla. Mar. 29, 2018) (citing *Bertolotti v. State*, 476 So. 2d 130, 134 (Fla. 1985)). "An attorney is allowed to argue reasonable inferences from the evidence and to argue credibility of witnesses or any other relevant issue so long as the argument is based on the evidence." *Id.* (citing *Miller v. State*, 926 So. 2d 1243, 1254– 55 (Fla. 2006)).

Here, the state judge was not unreasonable in concluding that the statements in opening, about the number of victims, the efforts expended by investigators, and the length of the crime spree reflect the quantity and quality of evidence implicating Cole and are thus not improper. Also, the comments about Carroll's admission of guilt implicating Cole is proper. Carroll's testimony did, in fact, inculpate both himself and Cole. The testimony had indicia of trustworthiness: it was specific, it matched the testimony of other witnesses, it was not always favorable to Carroll and was not always unfavorable to Cole.

Moreover, the defense effectively cross-examined Carroll about the sentence he faced, the fact that he lied to police after the second Harvey's robbery, and that he was testifying to get a better sentence in his case. The prosecutor's comments

pointing out that Carroll's testimony implicated both him and Cole were thus not improper.

Cole also cannot show the comments prejudiced him.   To establish a substantial error by counsel for failure to object to prosecutorial misconduct, the prosecutor's "comments must either deprive the defendant of a fair and impartial trial, materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to reach a more severe verdict than it would have otherwise." *Walls v. State*, 926 So.2d 1156, 1167 (Fla. 2006).

The state court found that Cole was not prejudiced because "this was a slam dunk case.  I mean, let's be serious about it.  There was a great deal of evidence against Mr. Cole."  *Id.* at 349.  The state court's conclusions are reasonable and supported by the record.  *See supra* section I.C. for a discussion of the quantity and quality of evidence introduced at trial that implicated Cole.   Because of the overwhelming evidence against him, Cole cannot show prejudice under *Strickland* and so denial of these claims on the merits by the 3.850 judge was not contrary to, and did not involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.  28 U.S.C. § 2254(d).

Thus, the denial of relief on this Ground is appropriate regardless of whether Cole exhausted this claim.  The overwhelming evidence against Cole demonstrates that, if the court found that Cole had failed to fairly present these arguments to the

state court, he would not be able to satisfy the "cause and prejudice" or "actual innocence" exceptions to excuse his procedural default of this claim.

That is, although Cole is correct that *Martinez* recognized a "narrow exception" to the general rule by holding that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish **cause** for a prisoner's procedural default of a claim of ineffective assistance at trial," 132 S.Ct. at 1315 (emphasis added), *Martinez* did not relieve the petitioner from the burden of establishing "**prejudice**." *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (emphasis added) ("Once cause is established, however, the petitioner also must show actual prejudice from the alleged constitutional violation.").

Simply put, Cole has not met his burden of showing that any error "worked to [his] actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). That is, Cole has not demonstrated that there is at least a reasonable probability that the result of the proceeding would have been different, and so the state court reasonably concluded that any error "had no chance of having affected the outcome of this case." ECF Doc. 15-7 at 349; *see Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003).

### G.   Ground Seven: IATC for Failing to Object and Move for a Mistrial Based on Improper Bolstering of Carroll

The claims in Ground Seven overlap with those in Ground Six.  Cole argues defense counsel was ineffective for "failing to object to and move for a mistrial both during the repeated acts of bolstering [the State's] witness by the prosecutor and again when the prosecutor argued that its bolstered witness indicated Petitioner was guilty."  ECF Doc. 1 at 17.  Specifically, Cole argues "the prosecutor walked the detective through each and every count that involved Petitioner, and had the detective testify that codefendant Carroll not only voluntarily implicated himself in every circumstance, but also 'took full responsibility for what he did.'  This is the epitome of bolstering."  *Id.*

At the end of the evidentiary hearing, the state court judge (who was also the trial judge) denied relief on this claim in open court because he did not find the questions and answers to be objectionable.  ECF Doc. 15-7 at 348.  Additionally, the judge did not find prejudice given that "this was a slam dunk case" against Cole. *Id.* at 348-49.

An attorney is permitted to argue credibility but cannot bolster or vouch for the credibility of a witness.  *Wade v. State*, 41 So. 3d 857, 869 (Fla. 2010); *see also United States v. Bernal–Benitez*, 594 F.3d 1303, 1314 (11th Cir. 2010) (holding that "[t]he rule against bolstering, does not, however, prevent the prosecutor from commenting on a witness's credibility, which can be central to the government's

case").  "Improper vouching or bolstering occurs when the State places the prestige of the government behind the witness or indicates that information not presented to the jury supports the witness's testimony."  *Wade*, 41 So. 3d at 869 (quotations omitted).

Further, "the prosecutor, as an advocate, is entitled to make a fair response to the arguments of defense counsel."  *United States v. Sarmiento*, 744 F.2d 755, 765 (11th Cir. 1984) (quotation and alteration omitted); *see also United States v. Eley*, 723 F.2d 1522, 1526 (11th Cir. 1984) (explaining that "[d]efense counsel in this case attacked the credibility of the government's witnesses and, in response, the prosecutor was entitled to argue fairly to the jury the credibility of the government and defense witnesses").  Finally, "[a] prosecutor's comments in closing statement must be viewed in the context of the trial as a whole." *United States v. Reeves*, 742 F.3d 487, 505 (11th Cir. 2014).

Here, the prosecutor did not vouch for Carroll's credibility or refer to information outside of Carroll's testimony to argue for Carroll's credibility.  Also, the defense's strategy on cross-examination was to question Carroll's self-interest in testifying.  The prosecutor pointing out that Carroll's testimony implicated himself as much as it implicated Cole does not rise to the level of bolstering.  Also, as noted above in Ground Six, the evidence against Cole was overwhelming.  Therefore, the comments of the prosecutor would have little, if any, effect on the outcome.

Accordingly, the undersigned finds that the state court's denial of relief on this ground was neither contrary to nor an unreasonable application of *Strickland* or any other clearly established federal law as determined by the Supreme Court. Moreover, his findings were not unreasonable in light of the evidence developed in state court. 28 U.S.C. § 2254(d).

### H. Ground Eight: IATC for Failing to Object and Move for a Curative Instruction as to the State's Improper Characterization of DNA Statistics

Cole argues trial counsel was ineffective for failing to object to, or seek a curative instruction about, the prosecutor's closing argument that Cole was a 99 percent match to the DNA evidence discovered by law enforcement. Cole claims "neither of the DNA experts testified that his DNA matched the DNA on the items that were tested; they merely stated that he was a possible contributor." Cole complains that "in closing arguments, the prosecutor vehemently maintained that the DNA evidence indicated that Petitioner DNA matched the DNA discovered on the items found on the scene of the crimes." ECF Doc. 1 at 19.

The state court denied this claim in open court at the end of the evidentiary hearing. ECF Doc. 15-7 at 349-51. The judge noted that defense counsel's reluctance to object during closing was a common strategic choice, as "most defense attorneys don't make arguments during closing argument unless it's something very damaging." *Id.* at 349-50. The judge also found the comment was fair because the DNA experts testified that only .35 % (that is, around one-third of one percent) of

the African-American population could have deposited the DNA found on the objects tested. "That's huge. So for [the prosecutor] to emphasize that in closing is what he should have been doing." *Id.* at 350. The judge found that "Mr. Hobbs, you know, made a pretty good effort with what he had to work with of explaining away the DNA by saying these were all friends, maybe the DNA got on these items from them sharing a hat, sharing gloves. I think that's the way a good defense attorney deals with this very damaging testimony. I think he did what a good attorney did." *Id.* at 350-51. Additionally, the state court also found no prejudice because "this was a very strong State case." *Id.* at 351.

The state court's decision is reasonable and supported by the record. The DNA experts testified that the DNA results excluded 99.65 and 99 percent of African-Americans from being the donors but did not exclude Cole. *See, supra,* section I.C(4), for a discussion of the testimony of the DNA experts. Those figures corroborate Williams and Carroll's testimonies that Cole was involved in a series of armed robberies. They were fair comments to rebut the defense claim that the jury should have reasonable doubts as to guilt. An objection therefore would have been futile.

Also, the State points out the prosecutor's mention of the 99.65 percent exclusion figure was relatively brief, so it was not grounds for a mistrial. In light of the other evidence, there is no probability the prosecutor's argument changed the course of the trial. Judge Hankinson's rejection of this claim was not contrary to,

and did not involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court or an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

## I.    Ground Nine: IATC for Failing to Move for a Judgment of Acquittal Based on Count Two as Constituting Double Jeopardy

Cole argues trial counsel should have challenged the dual convictions for racketeering, in Count One, and conspiracy to commit racketeering, in Count Two, as violating the Double Jeopardy clause. ECF Doc. 1 at 20-21. The state judge denied relief on this claim, finding "Defendant cannot show deficient performance, as the dual convictions did not violate double jeopardy." ECF Doc. 15-7 at 67. This conclusion is reasonable and consistent with Florida and federal law.

In determining the constitutionality of multiple convictions and sentences for offenses arising from the same criminal transaction, the dispositive question is whether the legislature "intended to authorize separate punishments for the two crimes." *M.P. v. State*, 682 So. 2d 79, 81 (Fla. 1996) (citing *Albernaz v. United States*, 450 U.S. 333, 344 (1981)). Legislative intent to authorize separate punishments can be explicitly stated in a statute, *Albernaz*, 450 U.S. at 340, or can be discerned through the *Blockburger* test of statutory construction. *Blockburger v. United States*, 284 U.S. 299 (1932).

The *Blockburger* test, which is also called the "same-elements" test, asks whether each offense contains an element not contained in the other; if not, they are

the same offense and double jeopardy bars subsequent punishment or prosecution. The *Blockburger* test has been codified in Florida at section 775.021(4), Florida Statutes (1995).

Under Florida law, conspiracy to commit racketeering and racketeering each contain elements not found in the other. The gravamen of a conspiracy "is premised not upon the commission of the predicate acts of racketeering, or even an agreement to commit predicate acts, but upon an agreement to participate in the affairs of the criminal enterprise through a pattern of racketeering activity." *State v. Reyan*, 145 So.3d 133, 139 (Fla. 3d DCA 2014). The State does not have to prove that a conspirator agreed to commit the predicate crimes himself, only that "a particular defendant agreed that a member of the conspiracy would commit two predicate racketeering acts." *United States v. Benabe*, 654 F.3d 753, 776 (7th Cir.2011). Thus, to convict a defendant of conspiracy, the jury need not agree as to the specific predicate acts that the defendant agreed someone would commit. *United States v. Randall*, 661 F.3d 1291, 1299 (10th Cir. 2011); *United States v. Applins*, 637 F.3d 59, 81–82 (2d Cir. 2011).

However, under Florida law, to prove a substantive racketeering charge under section 895.03(3), the State must prove the defendant's "(1) conduct or participation in an enterprise[ ] through (2) a pattern of racketeering activity." *Doorbal v. State*, 983 So.2d 464, 492 (Fla.2008). Thus, the State must establish a "pattern of racketeering activity" by presenting evidence that the defendant engaged in at least

two predicate acts that have the same or similar intents, results, accomplices, victims, or methods of commission. *See Morgan v. State*, 117 So.3d 79, 81–82 (Fla. 2d DCA 2013); *Sanchez v. State*, 89 So.3d 912, 914 (Fla. 2d DCA 2012).

For a conspiracy to commit racketeering, an agreement is required but not necessarily the actual commission of a pattern of activity. For racketeering, an overarching agreement is not required, but the actual commission of a pattern of racketeering activity is required. Since each offense contains an element not contained in the other, they are not the same offense and double jeopardy does not bar punishment or prosecution for both. *See* Fla. Stat. § 775.021(4); *Blockburger v. United States*, 284 U.S. 299 (1932). The state judge's conclusion that counsel was not ineffective for failing to raise a double jeopardy claim was therefore not contrary to, and did not involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d).

## J.    Ground Ten: Trial Court Error in Denying Judgment of Acquittal on Deadly Weapon Element on Count Eight

Cole argues the trial court erred in denying a judgment of acquittal on Count Eight, charging robbery of Harvey's on April 3, 2008 with a deadly weapon, because Cull testified he engaged in a fist fight with his assailant, not that a weapon was involved. ECF Doc. 1 at 23. Cole raised this on direct appeal, and the First DCA affirmed the conviction *per curiam*, without written opinion. Therefore, there is no written opinion setting out the State's rationale. "[W]here a state court's decision is

unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98.

Here, a reasonable basis exists for the state court to deny relief. First, questions of state law and procedure "rarely raise issues of federal constitutional significance, because '[a] state's interpretation of its own laws provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved.'" *Tejada v. Dugger*, 941 F.2d 1551, 1560 (11th Cir. 1991) (quoting *Carrizales v. Wainwright*, 699 F.2d 1053, 1053–54 (11th Cir. 1983)). Habeas review of a state law claim is therefore precluded if no due process violations or facts indicating such violations are alleged. This limitation is of equal force when a petition involving state law issues is "couched in terms of equal protection and due process." *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988) (quoting *Willeford v. Estelle*, 538 F.2d 1194, 1198 (5th Cir. 1976)).

Second, as pointed out above in Ground Three, there was some evidence that at least one of the co-perpetrators was armed, as one of the perpetrators said to the man struggling with Cull, "shoot him." ECF Doc. 15-2 at 42. Thus, a reasonable basis exists for the First DCA to affirm the denial of the judgment of acquittal.

## K.    Ground Eleven: Cumulative Effect of IATC and Other Errors

Cole argues the cumulative effect of trial counsel's errors made it reasonably probable that the outcome of the trial would have been different without the errors.

ECF Doc. 1 at 24. The state court denied this claim in open court at the end of the evidentiary hearing. ECF Doc. 15-7 at 349-51. The state court found throughout his ruling during the evidentiary hearing that this was a "slam dunk" case, "an overwhelming case", a "very strong State case" and "it was not close." Thus, Cole cannot show that the outcome would likely have changed by any changes in defense counsel's conduct.

Also, where, as here, the alleged errors urged for consideration in a cumulative error analysis "are either meritless, procedurally barred, or do not meet the *Strickland* standard for ineffective assistance of counsel[,] ... the contention of cumulative error is similarly without merit." *Bradley v. State*, 33 So. 3d 664, 684 (Fla. 2010) (quoting *Israel v. State*, 985 So.2d 510, 520 (Fla. 2008)); *see also Lowe v. State*, 2 So.3d 21, 33 (Fla. 2008) (holding that where individual claims are either procedurally barred or without merit, the cumulative error claim must fail). "Where there is no error or only a single error, there can be no cumulative error." *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011) (citation omitted). In other words, the State court and the undersigned has found no deficient performance by counsel, and therefore there cannot be a cumulative effect of counsel error.

## L.    An Evidentiary Hearing is not Warranted

The undersigned also finds that an evidentiary hearing is not warranted. In deciding whether to grant an evidentiary hearing, this Court must consider "whether such a hearing could enable an applicant to prove the petition's factual allegations,

which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).  As discussed above, Cole's arguments are affirmatively contradicted by the record.  Moreover, the state court held an evidentiary hearing on four of the grounds asserted, ECF Doc. 15-7 at 68, and this Court is to give deference to the state court's credibility and factual determinations. Under AEDPA's deferential standard, state court factual determinations are "presumed to be correct" unless the petitioner rebuts them "by clear and convincing evidence."  28 U.S.C. § 2254(e)(1) & (d)(2) (requiring federal courts to accept state court adjudications unless they "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding").  Therefore, an evidentiary hearing is not appropriate in this case. *See Aron v. United States*, 291 F.3d 708, 714-15 (11th Cir. 2002) (citation omitted).

## CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

After review of the record, the Court finds no substantial showing of the denial of a constitutional right.  § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, it is also recommended that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Rule 11(a), Rules Governing Section 2254 Cases.  If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

 Accordingly, it is respectfully RECOMMENDED:

1.     That Petitioner's petition under 28 U.S.C. § 2254 be DENIED, without an evidentiary hearing;

2.     That a certificate of appealability be DENIED; and

3.     That the clerk close this matter.

DONE AND ORDERED this 10th day of January, 2020.


*s/ Hope Thai Cannon*
**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations may be filed within 14 days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.  A copy of objections shall be served upon the Magistrate Judge and all other parties. A party failing to object to a Magistrate Judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.